# EXHIBIT B

<u>TRANSCRIBED FROM DIGITAL RECORDING</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SUNDIN, | ) | |
|              Plaintiff, | ) | |
| -vs- | ) | Case No. 13 C 1560 |
| STELLAR RECOVERY, INC., and | ) | Chicago, Illinois |
| DOES 1-10, | ) | April 15, 2016 |
| | ) | 9:06 a.m. |
|              Defendants. | ) | |
| ------------------------------- | ) | |
| AMANDA KNAPP-ELLIS, on behalf | ) | Case No. 16 C 2187 |
| of herself and all others | ) | |
| similarly situated, et al., | ) | |
| -vs- | ) | |
| STELLAR RECOVERY, INC., a | ) | |
| Florida corporation, | ) | |
|              Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SIDNEY I. SCHENKIER, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:    MS. BETH ELLEN TERRELL
                         Terrell Marshall Law Group PLLC
                         936 N. 34th Street, Suite 300
                         Seattle, WA  98103-8869
                         (206) 816-6603
                         E-mail:  Bterrell@terrellmarshall.com

                         MS. CASSANDRA P. MILLER
                         Edelman, Combs, Latturner & Goodwin LLC
                         120 S. LaSalle Street, Suite 1800
                         Chicago, IL  60603
                         (312) 739-4200
                         E-mail: Cmiller@edcombs.com

      **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
        NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
          PORTIONS UNINTELLIGIBLE AND INAUDIBLE

1    APPEARANCES:   (Continued)

2    For the Defendant
     Stellar:                    MS. KATHERINE H. OBLAK
3                                Hinshaw & Culbertson LLP
                                 222 N. LaSalle Street, Suite 300
4                                Chicago, IL  60601
                                 (312) 704-3202
5                                E-mail: Ktresley@hinshawlaw.com

6                                MR. BENJAMIN NICHOLAS HUTNICK
                                 (Via speaker phone)
7                                Berman & Rabin, P.A.
                                 15280 Metcalf
8                                Overland Park, KS  66223
                                 (913) 649-1555
9                                E-mail: Bhutnick@bermanrabin.com

10

11

12

13

14

15

16

17

18

19

20

21   Transcriber:

22                   KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                              Official Court Reporter
23                          United States District Court
                      219 South Dearborn Street, Suite 2524-A
24                           Chicago, Illinois  60604
                            Telephone:  (312) 435-5569
25                     Kathleen_Fennell@ilnd.uscourts.gov

1        (Proceedings heard in open court:)

2            THE CLERK:  Case number 13 C 1560, Sundin versus

3    Stellar Recovery, et al., and 16 C 2187, Knapp-Ellis versus

4    Stellar Recovery, Inc., preliminary approval hearing.

5            MS. TERRELL:  Good morning, your Honor, Beth Terrell,

6    Terrell Marshall Law Group on behalf of the plaintiffs and the

7    class.

8            MS. OBLAK:  Good morning, your Honor.  Katherine

9    Oblak, local counsel for the defendant.

10           THE COURT:  And why don't we have counsel who's

11   participating by phone identify himself.

12           MR. HUTNICK:  Ben Hutnick at Berman & Rabin for the

13   defendant, your Honor.

14           THE COURT:  Good morning, everybody.  We're here on

15   the preliminary approval motion which I've taken a look at.

16           Let me ask if there's anything that any of the

17   lawyers want to say to add to or elaborate on what's in the

18   motion?

19           MS. TERRELL:  I don't think so, your Honor.  I think

20   this is from our perspective the best settlement we could get

21   under the circumstances, and we would ask that it be approved

22   so we can move forward.

23           THE COURT:  Let me -- I have a few questions.

24           One is with respect to the defendant's financial

25   condition.  I think that there was some reference to me

1    getting some financial information *in camera*.

2           MS. TERRELL:  I think that -- I think the statement

3    was if your Honor would like it, they will provide it.

4           THE COURT:  All right.  With respect to insurance,

5    tell me what was explored with respect to the availability of

6    insurance.

7           MS. TERRELL:  Perhaps Mr. Hutnick would like to

8    respond to that?

9           MR. HUTNICK:  Certainly.

10          Well, initially, the defendant hadn't turned in a

11   claim on it, although my understanding is that the carrier was

12   notified.

13          THE COURT:  I'm sorry, was or was not?

14          MR. HUTNICK:  Was notified.

15          THE COURT:  Okay.

16          MR. HUTNICK:  And there was some [inaudible] in the

17   settlement conference about whether the insurance company was

18   properly notified, but I think in the end, part of the issue

19   with the insurance was that there was a lapse in coverage at a

20   certain point, and so even if insurance had been gone through,

21   a substantial portion of the class wouldn't have been covered

22   by insurance.

23          THE COURT:  All right.  Do you have an idea what

24   the -- if there was coverage for the periods where there

25   wasn't a lapse what the policy limits were, anything like

1  that?

2      MR. HUTNICK:  We have a copy of the policy, and I

3  believe it's actually a couple of different insurance

4  companies because of the length of the class period.

5      THE COURT:  Yes.

6      MR. HUTNICK:  Our understanding from the insurance

7  company is that they would have declined coverage for various

8  reasons, but if your Honor would like a copy of the insurance

9  policy with limits, we can provide that as well.

10     THE COURT:  Actually, I'd like the lawyers who are

11 asking for the final -- or preliminary approval to actually

12 provide that information.

13     MS. TERRELL:  Yes, your Honor, I believe --

14     THE COURT:  What the policy term of coverage is, what

15 would have been covered and what their position was as to why

16 there wasn't coverage because the CEO's declaration is silent

17 on that.

18     MS. TERRELL:  And my understanding was that the

19 representation on which we relied was that coverage had been

20 denied, not that it would be denied, so, yes, we would like to

21 look at that information.

22     THE COURT:  Okay.  So who's going to get it for me?

23     MR. HUTNICK:  I can -- yeah, I have a copy of the

24 letter that the insurance company sent regarding the claim and

25 the policy -- a copy of the policy and everything.

1        THE COURT:  Okay.  All right.  Then what I'd like you

2  to do is -- let me say this.  My inclination, I have some --

3  some questions, some things I would like adjusted, but I would

4  give preliminary approval, but before final approval, I would

5  like to get that information.

6        MS. TERRELL:  Well, your Honor, before we have

7  preliminary approval entered on a settlement that relies upon

8  not having adequate insurance proceeds, I'd like to see that

9  information and confirm it, so --

10       THE COURT:  Okay.

11       MS. MILLER:  Good morning, your Honor.  Apologize for

12  being late.  Cassandra Miller on behalf of plaintiff.

13       THE COURT:  Okay.  Of course, nobody stopped you from

14  getting it before today, did they, Ms. Terrell?

15       MS. TERRELL:  We understood that -- no, that's true,

16  but we had understood coverage had been denied.

17       MR. HUTNICK:  Yeah, and I apologize, but I believe we

18  actually sent a copy of the letter from the insurance company,

19  but there's been a lot of documents flying back and forth, so

20  it's possible they just got lost in the shuffle between

21  counsel.

22       MS. TERRELL:  We'll look at that very carefully, your

23  Honor, to make sure nothing has been missed.

24       THE COURT:  All right.  Well, I'd like to know, get

25  the letter of denial, but also what the position was as to the

1  defendant as to what the coverage --

2          MS. TERRELL:  Yes.

3          THE COURT:  -- would have been.

4          MS. TERRELL:  Yes.

5          THE COURT:  All right.  You know, this -- clearly the

6  presentation is that the defendant, absent any kind of very

7  clear and extensive coverage, would not have the financial

8  wherewithal to provide a meaningful amount of relief to the

9  very large number of putative class members if there was a

10  class certified and if liability was established.

11          MS. TERRELL:  That's correct.

12          THE COURT:  That much is clear, which is why the

13  parties pivoted to a 23(b)(2), and in looking at the motion,

14  there is certainly significant I'll call structural and

15  procedural change within the defendant that appears to be

16  quite positive and that would provide a number of safeguards

17  against repetition of what -- in the future of what the

18  plaintiffs say occurred in the past, and that relief is

19  certainly not something that comes without a cost to the

20  defendant because there are various costs that would be

21  incurred, and there would be a period of two years of

22  essentially monitoring with reports to the plaintiff class

23  counsel to verify that certain things were being done.

24          So all of that, it seems to me, is, you know,

25  significant benefit to the putative class.

1          I did have a question about some of the cost
2    calculations with respect to the relief.  It wasn't clear to
3    me how much of the cost that is calculated is out-of-pocket
4    expenditures for personnel and for monitoring and so forth, as
5    opposed to a projection of lost revenue because of some of
6    these additional procedures and safeguards.
7          Can anybody shed some light on that?
8          MR. HUTNICK:  I believe I can, your Honor.
9          THE COURT:  Please, Mr. Hutnick.
10         MR. HUTNICK:  Yes, I just have to pull up that
11   portion of the declaration and information.
12         MS. TERRELL:  For our part, I would say that our
13   understanding is we were trying to value it based on actual
14   out-of-pocket costs to the defendant to comply, and those were
15   changes made to both their telephone dialing system, as well
16   as training and monitoring and additional safeguards put in
17   place for preventing calls to people that subsequently revoked
18   their consent to receive calls.
19         THE COURT:  If you look at Paragraph 6 of
20   Mr. Schanck's declaration, he does say that some of the cost
21   is, it seems at least as I read it, attributable to a 25 to
22   30 percent reduction in overall production.
23         MR. HUTNICK:  Uh-huh.
24         MS. TERRELL:  Yeah, I think our understanding was,
25   though, that is separate from the actual out-of-pocket costs

1  associated with the new dialing procedures and training and
2  monitoring.

3          MR. HUTNICK:  Correct.

4          MS. TERRELL:  I think Mr. Hutnick can probably speak
5  to that.

6          THE COURT:  Go ahead, Mr. Hutnick.

7          MR. HUTNICK:  Sure.  And I think the declaration shed
8  some light on the actual cost incurrence.  Not counting
9  opportunity costs, the going-forward training cost for the
10  procedures they've implemented is approximately 15,000 per
11  year.

12          The scrubbing service that they use is $1,200 per
13  month.

14          The recording storage, which they can use for review
15  of TCPA complaints and to ensure continued compliance is
16  currently another 15,000 per month, increasing to $20,000 per
17  month moving forward just because of the volume of the storage
18  that's required for the recordings.

19          The implementation of increased quality monitoring on
20  top of the training, which was 15, is another $45,000 roughly
21  per year.

22          THE COURT:  All right.  So during the two-year
23  period, my calculation, as you were just reading off the
24  numbers, is that's in excess of $600,000.

25          MS. TERRELL:  That's right.

1        MR. HUTNICK:  Right.

2        THE COURT:  Depending on that range for the storage,

3   you know, where it is in that 15,000 to 27,000 a month, but if

4   you shop at a $20,000 number, that would be $480,000 over two

5   years.

6        So it's over 600,000 in out-of-pocket expenditures

7   without regard to, again, any loss of production because of

8   the rigors of these procedures.

9        MR. HUTNICK:  That's correct, your Honor, and

10  obviously the out-of-pocket -- I'm sorry, the cost for -- the

11  opportunity costs as far as production is concerned is a

12  little tougher to gauge because a lot of different things can

13  affect the bottom-line numbers, but their best estimates are

14  25 to 30 percent.

15       THE COURT:  So, but I would say that if we're looking

16  at a cost to the defendant from lower production, to the

17  extent the lower production is because it's not as productive

18  if it's not doing things that violate the law, that's not

19  really a benefit.

20       MR. HUTNICK:  Certainly, your Honor.

21       THE COURT:  Or I should say that's not a detriment to

22  the defendant that we would recognize.

23       To the extent that lower production is because people

24  have to take more time to do things, and so instead of calling

25  X number of people a day, you can only call Y people a day,

1   you know, and assuming all the calls were appropriate, that
2   certainly is a loss of production, and that is a cost to
3   defendant.

4          But I wanted to have this discussion because to make
5   the point that this is not simply a settlement where the
6   defendant agrees to pay the three class representatives a
7   certain amount of money, pay class counsel a certain amount of
8   money, and then basically gets off scot-free.

9          The defendant is actually doing meaningful things
10  within its organization in terms of its structures, has
11  out-of-pocket costs and perhaps production costs as well,
12  which I think is significant in terms of the overall
13  reasonableness of the settlement.

14         Since I referenced the class representatives and
15  class counsel, why don't we talk about those numbers for a
16  minute.  As I understood the petition, the amount of the award
17  or whether there is an award to the named plaintiff is not
18  something on which settlement turns.

19         MS. TERRELL:  That's correct, your Honor.

20         THE COURT:  All right.  It seems to me that the
21  numbers of 10,000 for each person are extremely high when I
22  take into account a settlement where -- I understand that the
23  class is not waiving monetary claims, but they don't get any
24  money.

25         And so certainly these three people did something

1    that no other class members did, they put their names on a

2    complaint.  But other than Sundin, who was deposed, I don't

3    know what else they did.  And I know it says that they did

4    this at risk.  I don't know what the risk is.  This isn't like

5    an employment case, where someone has the courage to file a

6    complaint against the employer.  This is a little bit

7    different.

8         Did any of the other defendant -- I'm sorry --

9    plaintiffs other than Sundin sit for deposition?

10        MS. TERRELL:  No, your Honor.

11        MS. MILLER:  No.  Sundin was the only one that was

12   deposed, but we did complete a significant amount of

13   discovery, and we were close to the end of discovery by the

14   time we sat down to settle.  So there was written discovery

15   which was prepared and exchanged and participation in terms of

16   providing documents and call logs and so forth, but there was

17   no deposition of the other plaintiffs.

18        THE COURT:  It strikes me that this number is high,

19   though.  I would be more comfortable with Sundin getting an

20   award of 4,000 and each of the other two 2,000.

21        MS. TERRELL:  That's fine, your Honor.

22        MS. MILLER:  That's fine, your Honor.

23        THE COURT:  With respect to the fees and costs, I

24   think that what is sought here is reasonable, and I measure

25   that reasonableness in a couple dimensions.  One of them is

1 with respect to what was presented as the lodestar figure,
2 that the amount sought of $105,000 is almost a third of the
3 lodestar fees plus costs, so that's a substantial discount
4 over the investment of time that plaintiffs' counsel put into
5 the case.

6 And I know that they did put a lot of time into the
7 case. There was a lot of discovery in the case. The
8 settlement talks were lengthy, complex, and required people to
9 really engage in a lot of thought and activity about how best
10 to manage a case that in a way turned out a little differently
11 than they may have anticipated at the front end, and I think
12 that we should applaud attorneys on both sides who don't get
13 locked into one vision of the case but are able to adapt as
14 the case evolves.

15 I think it's reasonable in another dimension that in
16 looking at the benefit to the class, and in injunctive relief
17 cases, it's hard because we can't do an arithmetic
18 calculation, the class got X dollars, the attorneys get Y
19 dollars, is that, you know, reasonable, here the class is not
20 getting any money, but, you know, Section 2.6 of the
21 settlement agreement also provides, as would be appropriate in
22 a (b)(2) class, that they are not waiving any monetary claims.

23 So anybody who thinks that there is a pot of gold
24 sitting with the defendant certainly would have the right to
25 pursue that individually or as a class.

1        But there is a benefit to the class from the

2   injunctive relief or the agreed procedure, and there is a

3   benefit to the class -- put a different way.  This amount is

4   reasonable when laid next to the amount that the defendant

5   will spend to do these things.

6        So those all are persuasive evidence that this is a

7   fair and reasonable amount of fees and costs and that, you

8   know, there isn't any collusion here.  Even though there is a

9   clear sailing provision, which increasingly in our circuit is

10  looked upon with some arched eyebrow, but certainly there is

11  no situation where that's teamed with a reverter, where you

12  would have even more concern.

13       So for those reasons, I do think the amount of fees

14  and costs are reasonable, and I would approve that

15  preliminarily.

16       With respect to a couple of the other considerations

17  that go into whether a settlement is to be given preliminary

18  approval as fair and reasonable, we've already talked about

19  the benefit to the class.  You know, measured against the risk

20  of going forward, it would strike me as very difficult in a

21  (b)(2) setting if the class established everything to do a lot

22  better than these kinds of procedures.  These procedures do

23  seem to me very robust and very significant in terms of the

24  kinds of things that you would ask a court to look at if there

25  was a plaintiff's verdict in a (b)(2) setting.

1        In terms of letting go of the (b)(3) claim, obviously
2    from the plaintiffs' side, the potential number of class
3    members is huge.  I think I saw the number 45 million.

4        MS. TERRELL:  45 million, yeah.

5        THE COURT:  And that, as I said, I am curious about
6    the insurance, but unless they had the most gold-plated
7    insurance of all time, that probably wouldn't have been enough
8    to provide anything meaningful even if there was success.

9        But there's also in this case, as in many of these
10   types of cases, significant barriers to ultimate success at
11   trial, issues of whether there would be a class certified
12   because of individualized and consent issues, among one of
13   many types of obstacles that would have to be surmounted, and
14   then in this case, if it was, the likelihood that that would
15   net any kind of monetary relief that would be measurable was
16   highly in doubt.

17       So for those reasons, I think that weighs in favor of
18   approval of the settlement.  Obviously, there was a lot of
19   work done in the case, so the settlement came at a stage in
20   the proceeding where the lawyers and the parties knew enough
21   to make reasonable judgments about what would be a fair and
22   reasonable settlement.

23       The settlement came at a time when there was still a
24   lot of work to do, class certification and many other things
25   after that, so this came at a time that would certainly

1  conserve resources but also provide relief at an earlier stage

2  than could be achieved if you went the distance and went

3  through class certification and potential summary judgment

4  practice and trial, which could take quite an extended period

5  of time.

6  And as I've said, I don't find anything to be

7  collusive about the negotiations or the fee amount.

8  So those factors lead me to conclude that the

9  settlement should be given preliminary approval as fair,

10  reasonable and adequate.  As I say, I'm happy to do that now

11  but get the information concerning the insurance so that we

12  have that to the extent it would bear on final approval.

13  MS. TERRELL:  All right.  Thank you, your Honor.

14  MS. MILLER:  And, your Honor, just -- I apologize I

15  wasn't here for the beginning part of this, but to the extent

16  this sheds any light, my firm did provide notice to the

17  insurance carrier separate and apart --

18  THE COURT:  Okay.

19  MS. MILLER:  -- and we did receive a rejection

20  letter, and we're happy to tender that to the Court.

21  And with respect to the amount of the insurance

22  coverage, there was actually a limitation on the amount that

23  would be covered for class actions.

24  THE COURT:  Okay.

25  MS. MILLER:  It limited it to -- I think it was in

1   the six figures.  So --

2           THE COURT:  Okay.  I think it would be good to file

3   that --

4           MS. MILLER:  Sure.

5           THE COURT: -- and you can -- with an affidavit --

6           MS. MILLER:  Sure.

7           THE COURT: -- and then that can be part of the record

8   concerning the settlement, okay?

9           MS. MILLER:  Sure.

10          THE COURT:  That leaves us with the notice issue, and

11  obviously this being a (b)(2) class, there is not a

12  requirement of any notice be given at all, particularly --

13  well, at least in a case where there isn't any kind of

14  monetary relief that's attached, as there isn't here.  Seventh

15  Circuit case, *Johnson versus Meriter Health Services*, 702 F.3d

16  364, a 2012 decision, makes that clear.

17          So the method that you have of giving notice I think

18  is creative.  At least in my experience, I haven't seen that

19  before.  I guess a question that I have is that when you

20  provide this to the legal aid societies and state attorney

21  generals, what is it that you expect them or you will ask them

22  to do with it?

23          MS. TERRELL:  Simply to make consumers aware of the

24  fact that there are -- if they are receiving calls, those

25  calls should stop, and that if they're continuing to get

1    calls, that they should report it because there is an order in
2    place that says they're not supposed to.

3          THE COURT:  Have you done this before, this kind of
4    notice?

5          MS. TERRELL:  We actually did recently in a case in
6    Soffit versus I think it was Enhanced Recovery Solutions, and
7    we provided the same type of notice that is being used here.

8          THE COURT:  Have you been in contact with legal aid
9    societies, state attorney generals so that you have an idea
10   what they do with it?  I mean, do they post it in their
11   office?  Do they just consult people?

12         I'm just kind of curious about what happens when you
13   send it to entities who I would understand why they might deal
14   with people who could have an interest.

15         MS. TERRELL:  The idea is that would be posted in a
16   place that consumers would be able to see it, a lobby or some
17   kind of bulletin board.

18         THE COURT:  And they're agreeable to doing this in
19   your experience?

20         MS. TERRELL:  Yes.  They did in the other case, and
21   we can confirm here with cover letter, but, yeah.

22         THE COURT:  All right.  And I tend to agree that
23   notice in this kind of situation by this means is probably a
24   little more directed than if you just have in a mass
25   publication newspaper.

1          MS. TERRELL:  Sure.

2          THE COURT:  I do have a couple questions about the

3     substance of the notice, and my guess is that you had an

4     interest in trying to keep it within one page for posting

5     purposes, but I think that it is useful to add in a few

6     things.

7          MS. TERRELL:  Okay.

8          THE COURT:  One is that to make it clear to them, it

9     pertains to the bullet point about they retaining their

10    rights.

11         MS. TERRELL:  Yes.

12         THE COURT:  I think that they have a right to know

13    that the three plaintiffs are getting some money.

14         MS. TERRELL:  Okay.

15         THE COURT:  I think they have a right to know what

16    the plaintiffs' fees are.  And while they do not get monetary

17    relief, then you have -- you retain a right to seek it if you

18    wish to do so, and you may want to add in that it's been on

19    this basis because, you know, thorough investigation

20    determined that the defendant lacked the resources to provide

21    any meaningful, you know, financial relief.

22         It may be a useful thing to put in there in terms of

23    them knowing they have a right to sue, but is there going to

24    be any efficacy.

25         MS. TERRELL:  All right.

1         THE COURT:  All right?  So does anybody have any
2    problem with those additions?
3         MS. TERRELL:  No, your Honor.
4         MS. MILLER:  No.
5         MR. HUTNICK:  No, your Honor.
6         THE COURT:  Okay.  Then with those changes, I would
7    approve the notice as compliant with the requirements of due
8    process.
9         MS. TERRELL:  Would you like us to resubmit the
10   notice?
11        THE COURT:  That would be good.  You know, if you can
12   keep it on a page, then -- where people actually who have
13   vision like mine could see it, that would be good.
14        MS. TERRELL:  Okay.
15        THE COURT:  All right?  Okay.  So you have tendered a
16   proposed preliminary approval order.
17        MS. TERRELL:  And we can resubmit that through the
18   agreed --
19        THE COURT:  Why don't you do it to the agreed order
20   box.  We do need to fill in some dates, and what I would like
21   to do is on the portions where you have 90 days or five days
22   or things like that, I think it's much better to put dates on
23   the calendar.
24        MS. TERRELL:  Absolutely, your Honor.  Those are just
25   place holders to give you a sense of the sort of timing.

1        MS. MILLER:  Timing.

2        MS. TERRELL:  Yeah.

3        THE COURT:  And those dates seem fine to me.

4        MS. TERRELL:  Okay.

5        THE COURT:  So in terms of a final approval hearing,

6   what would you propose?

7        MS. TERRELL:  So we're looking at 180 -- are we in

8   December?  Is that where we are?

9        MS. MILLER:  Yes.

10        THE COURT:  So let's assume I'm going to enter --

11   you'll submit to me later today a preliminary approval order

12   but I don't get it entered until Monday.

13        MS. TERRELL:  Okay.  We'll just give you a schedule

14   based on that, your Honor, does that make sense?  But you want

15   to set it --

16        THE COURT:  I'd like to give you the dates just so

17   that I don't want you to put a date in there that for some

18   reason I'm not available.

19        MS. TERRELL:  That's four months, that's five months,

20   five-and-a-half months.

21        MS. MILLER:  Five-and-a-half months.

22        MS. TERRELL:  Is it five-and-a-half months?  120.

23        MR. HUTNICK:  Five-and-a-half would be --

24        MS. TERRELL:  Five-and-a-half months.  Maybe

25   beginning of October?

1    MS. MILLER:  Yeah, does that look right, Ben?  You

2 probably have a calendar in front of you.

3    MR. HUTNICK:  Yeah, that looks right to me.

4    THE COURT:  Okay.  Then why don't we set a date for

5 the final approval hearing of, Jenny, what do we look like the

6 week of October 10th?

7    THE CLERK:  You don't have anything scheduled on

8 Tuesday.

9    THE COURT:  Okay.

10    THE CLERK:  Monday also.

11    THE COURT:  Okay.  Why don't we say 11:00 a.m. on

12 Monday, October 10th, and then what you can do is use that

13 date and track backwards to put into the order the appropriate

14 dates.

15    MS. TERRELL:  And into the notice.

16    THE COURT:  Exactly.

17    MS. TERRELL:  Okay.

18    THE COURT:  Okay?

19    MS. TERRELL:  Okay.

20    THE COURT:  All right.  Anything else today?

21    MS. TERRELL:  No, your Honor.

22    THE COURT:  All right.  Thanks very much.

23    Thanks for your hard work.  I know that this was one

24 that took a lot of effort.  And, you know, it's easy when you

25 hit obstacles to say, gee, I'm going to throw up my hands and

1  not accomplish something, but you guys didn't do that, so I

2  applaud you for that.

3       Thank you very much.

4       MS. TERRELL:  Thank you, your Honor.

5       MS. MILLER:  Thank you.

6       MR. HUTNICK:  Thank you, your Honor.  Thanks,

7  everyone.

8       (Which were all the proceedings heard.)

9                       CERTIFICATE

10      I certify that the foregoing is a correct transcript from

11  the digital recording of proceedings in the above-entitled

12  matter to the best of my ability, given the limitations of

13  using a digital-recording system.

14

15  /s/Kathleen M. Fennell              May 16, 2016

16  _____          _____

17  Kathleen M. Fennell                 Date
   Official Court Reporter

18

19

20

21

22

23

24

25